**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 18, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN W. PROCTOR,

        Plaintiff - Appellant,

    v.

UNITED PARCEL SERVICE,

        Defendant - Appellee.

No. 06-3115

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D. Ct. No. 04-CV-2388-RDR)**

---

Alan V. Johnson (Stephen D. Lanterman, with him on the briefs), Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., Topeka, Kansas, appearing for Appellant.

Daniel K. O'Toole, Armstrong Teasdale LLP, St. Louis, Missouri, appearing for Appellee.

---

Before **TACHA**, Chief Circuit Judge, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

      Plaintiff-Appellant John Proctor appeals the District Court's entry of

summary judgment in favor of Defendant-Appellee United Parcel Service (UPS)

on his claims that UPS terminated him in retaliation for filing administrative charges of disability discrimination in violation of the American with Disabilities Act (ADA), 42 U.S.C. § 12203(a), and for filing workers' compensation claims, in violation of Kansas law. We have jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

Mr. Proctor was employed by UPS as a package car driver, a position that requires an employee to lift, lower, leverage, and manipulate packages weighing up to seventy pounds and to work extended hours when necessary. In February 1998, he underwent surgery on his wrist for a job-related injury and eventually returned to work. In October 1999, he sustained a job-related injury to his back, after which he was examined by Dr. Fevurly, UPS's doctor, who released him to return to work with no restrictions on November 8, 1999. One week later, he suffered another work-related injury to his back. Mr. Proctor pursued workers' compensation claims based on his injuries, filing the latest of these claims in November 1999.

The following month, in December 1999, Mr. Proctor returned to UPS for a brief period after Dr. Fevurly released him to return to work with a lifting restriction of thirty pounds. His last day working at UPS was December 24, 1999. From January 2000 to July 2000, Mr. Proctor was examined by Dr. Fevurly several times. In July 2000, Dr. Fevurly concluded that he had reached

"maximum medical improvement" and imposed a permanent fifty-pound lifting restriction.

According to Mr. Proctor, he was subject to medical restrictions that prevented him from performing his job duties until January 2002. During this time, Mr. Proctor continued to be treated by his own physicians in addition to seeing Dr. Fevurly. His back doctor, Dr. Prostic, released him to return to work with no restrictions on February 1, 2002, and his wrist doctor, Dr. Ketchum, issued a full release on April 3, 2002. When UPS did not allow Mr. Proctor to return to work despite his doctors' releases, he filed a grievance against UPS for violating the collective bargaining agreement (CBA) between UPS and Mr. Proctor's union, the International Brotherhood of Teamsters, Local Union No. 696 (Union). Under the CBA, after an employee presents UPS with a doctor's return-to-work slip, the company doctor must examine the employee within three working days. After Mr. Proctor filed the grievance, the company doctor, Dr. Fevurly, examined Mr. Proctor and did not release him to return to work, concluding that his work status was "to be determined."

Under the CBA, when UPS's doctor (i.e., Dr. Fevurly) and an employee's doctor disagree, UPS and the Union must agree on a third doctor whose decision is "final and binding" on the employer, the Union, and the employee. Pursuant to this provision of the CBA, on April 30, 2002, Dr. Brown, the doctor selected by UPS and the Union, examined Mr. Proctor and imposed a lifting restriction of

forty pounds. In addition, in his medical evaluation, Dr. Brown specifically stated: "I do not recommend that he return to package car driving at United Parcel Service." Following Dr. Brown's evaluation, UPS continued to deny Mr. Proctor's requests to return to work.

A few months later, in July 2002, Mr. Proctor requested an accommodation under the ADA. In August 2002, UPS asked Dr. Fevurly to clarify his opinion regarding Mr. Proctor's ability to perform the essential functions of a package car driver. In response, Dr. Fevurly stated that Mr. Proctor is not qualified to perform the essential functions of his job, including the frequent lifting of seventy pounds as specified in the written description of the job's essential functions. In March 2003, UPS notified Mr. Proctor by letter of its decision to deny his request for an accommodation, stating: "[B]ased upon the medical information that we have received, we are unable to conclude that you are eligible for a reasonable accommodation pursuant to the Americans with Disabilities Act." The letter also directed Mr. Proctor to call the district workforce planning manager with any questions "concerning [his] entitlement to benefits or [his] employment status at this time."

A few days later, on March 18, Mr. Proctor was examined by Dr. Poppa, a doctor retained by UPS's insurance carrier to provide an independent medical evaluation in connection with Mr. Proctor's workers' compensation case. In his evaluation, Dr. Poppa noted that Mr. Proctor had reached maximum medical

improvement with respect to all work-related injuries and was therefore able to return to work with restrictions, including "occasional lifting from floor to knuckle of 70 pounds; occasional lifting of knuckle to shoulder height at 55 pounds; occasional lifting from shoulder to overhead of 45 pounds; [and] occasional carrying 70 pounds at 50 feet."

That same month, in March 2003, Mr. Proctor filed an administrative charge with the Office of Federal Contract Compliance Program (OFCCP), alleging disability discrimination for UPS's failure to accommodate him and return him to work. The following May, he filed a similar charge with the Equal Employment Opportunity Commission (EEOC), and in September 2003, he filed a charge with the Kansas Human Rights Commission (KHRC).

In June 2003, an administrative law judge awarded Mr. Proctor benefits on his workers' compensation claims, which UPS appealed to the Appeals Board for the Kansas Division of Workers Compensation. In July, Mr. Proctor attended the last local hearing regarding his grievance against UPS for not returning him to work. During the hearing, Mr. Proctor's union representative telephoned Monica Sloan, a district occupational health manager for UPS, to check on the status of settlement negotiations concerning Mr. Proctor's workers' compensation claims and to ask whether UPS was going to permit Mr. Proctor to return to work. According to Mr. Proctor, Ms. Sloan responded: "[W]e're going to pay him a work comp settlement and as far as I'm concerned he can go eat shit and die."

By December 2003, all three administrative agencies (the OFCCP, EEOC, and KHRC) had issued findings of no probable cause on Mr. Proctor's charges of disability discrimination, as well as right-to-sue letters. Mr. Proctor did not, however, file suit based on these letters. In addition, on December 31, 2003, the Appeals Board for the Kansas Division of Workers Compensation issued its decision, resolving UPS's appeal of Mr. Proctor's benefits award.

On January 14, 2004, Ms. Sloan notified Mr. Proctor's union representative by letter that UPS had closed all Mr. Proctor's workers' compensation claims and that Mr. Proctor would be separated from employment with UPS as of January 14, 2004. This letter is the only documentation of Mr. Proctor's termination in the record. According to Ms. Sloan's testimony, the termination letter resulted from UPS's policy and practice of terminating an employee who has not returned to work once the employee's workers' compensation claims are resolved.

The following May, Mr. Proctor filed a questionnaire with the EEOC, which the agency treated as a second charge of discrimination. On May 20, 2004, the EEOC issued a right-to-sue letter, and on August 20, 2004, Mr. Proctor filed suit against UPS in federal district court, asserting claims of discrimination and retaliatory discharge in violation of federal and state law. Although he alleged that UPS violated federal and state law in failing to grant his request for a

reasonable accommodation for his disability,[1] the only claims on appeal are those involving his termination. He asserts that UPS violated the ADA by terminating him in retaliation for filing administrative charges of disability discrimination and that UPS violated Kansas law by terminating him in retaliation for filing workers' compensation claims. The District Court entered summary judgment in favor of UPS on both claims, finding that Mr. Proctor had failed to raise a genuine issue of material fact with respect to the merits of either claim. The court also indicated that Mr. Proctor's ADA claim could be dismissed as untimely because he failed to file a timely administrative charge challenging UPS's unlawful retaliation.[2] For

---

[1]Specifically, Mr. Proctor alleged that UPS violated both the ADA and the Kansas Act Against Discrimination, Kan. Stat. Ann. § 44-1001 et seq., when it denied his request for a reasonable accommodation for his disability. The District Court entered summary judgment in favor of UPS on both claims.

[2]UPS also argues that Mr. Proctor's claims are "preempted" by § 301 of the Labor and Management Relations Act, 29 U.S.C. § 185, because they involve interpretation of the CBA. But Mr. Proctor's ADA claim is clearly not preempted by § 301 because one federal statute cannot preempt another and UPS does not argue that § 301 repeals provisions of the ADA by implication. *See J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141–42 (2001) (discussing standard for implied repeal of one federal statute by another). Mr. Proctor is therefore entitled to assert his federal statutory right under the ADA, provided the claim is actually based on the ADA. *See Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 79 (1998). Mr. Proctor does not challenge UPS's interpretation of CBA procedures for determining when an employee may not return to work; instead, he argues that UPS's reliance on the CBA is a pretext for retaliation. His cause of action therefore arises under the ADA, not the CBA. Moreover, because we need not interpret the CBA, Mr. Proctor's state law claim is not preempted. *See Garley v. Sandia Corp.*, 236 F.3d 1200, 1209 (10th Cir. 2001) (noting that § 301 preempts state law claims when the court must interpret the CBA).

-7-

the reasons specified below, we affirm the District Court's entry of summary judgment in UPS's favor on both claims.

## II. DISCUSSION

We review the grant of a summary judgment motion de novo, applying the same standards as the district court. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). In reviewing the record, we view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Id.* We will affirm a district court's grant of summary judgment unless the evidence in the record demonstrates a genuine issue of material fact. *Id.*; *see also Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) ("An issue of fact is genuine if the evidence allows a reasonable jury to resolve the issue either way and is material when it is essential to the proper disposition of the claim." (quotations omitted)). We may affirm the district court's decision "for any reason supported by the record." *Stover*, 382 F.3d at 1070 (quotation omitted).

A.    Timeliness of Retaliation Claim under the ADA

For Mr. Proctor's retaliation claim under the ADA to be timely, he must have filed an administrative charge within 300 days of the challenged employment action and have filed suit in federal court within ninety days of receiving the agency's right-to-sue letter. *See* 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions, including administrative filing

requirements under 42 U.S.C. § 2000e-5(e)(1), (f)(1));[3] *see also Haynes*, 456 F.3d at 1222 (noting a plaintiff must file an administrative charge within 300 days of discriminatory action before filing a civil suit under the ADA). In general, "a cause of action accrues 'on the date the employee is notified of an adverse employment decision by the employer.'" *Haynes*, 456 F.3d at 1222 (quoting *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003)). An employee receives notice of an "adverse employment decision when a particular event or decision is announced by the employer." *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

The District Court concluded that UPS notified Mr. Proctor of its decision not to return him to work by March 2003. By this time, Mr. Proctor had notice of Dr. Brown's final and binding decision recommending he not return to work as a package car driver and of UPS's decision to deny his request for an accommodation. Although Mr. Proctor filed administrative charges in March 2003 alleging disability discrimination based on UPS's failure to accommodate him, he did not file a civil suit on this basis after receiving right-to-sue letters. Moreover, because the District Court found that Mr. Proctor had notice by March 2003 that he would not be returned to work, it found the administrative charge

---

[3]Mr. Proctor had 300 days, rather than 180 days, under the statute because Kansas is a "deferral state," that is, a state with an agency empowered to investigate employment discrimination, Kan. Stat. Ann. §§ 44-1003, -1004. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 n.1 (10th Cir. 2003).

filed in May 2004 to be untimely and concluded that Mr. Proctor's civil suit based on this charge may be dismissed.

To determine whether Mr. Proctor's ADA claim should be dismissed as untimely, we must "identify precisely the 'unlawful employment practice' of which he complains." *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980). Although Mr. Proctor purports to challenge his termination, announced in the January 14, 2004 letter, UPS argues that he had previous notice that he would not be returned to work based on Dr. Brown's final and binding decision under the CBA and the company's determination that he was not entitled to an accommodation. Citing the Supreme Court's decision in *Ricks*, UPS characterizes Mr. Proctor's termination in 2004 as "a delayed, but inevitable, consequence" of these earlier decisions. *Id.* at 257–58. In *Ricks*, the Supreme Court held that the limitations period for filing an administrative complaint began to run when a professor was denied tenure, rather than when his one-year terminal contract ended, because the "eventual loss of a teaching position" was a "delayed, but inevitable, consequence of the denial of tenure." *Id.*

Notably, in *Ricks*, as well as in the Supreme Court's most recent decision on this issue, *Ledbetter v. Goodyear Tire & Rubber Co.*, – U.S. – , 127 S. Ct. 2162 (2007), the plaintiff did not assert that the employer acted with unlawful intent *during* the charging period (i.e., within the 300 days prior to the filing of an administrative charge); rather, the plaintiff argued that the challenged action gave

effect to discriminatory acts that occurred outside the charging period. *See id.* at 2167 (rejecting the argument that "it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period"); *Ricks*, 449 U.S. at 257–58 (holding that plaintiff could not rely on a discriminatory act occurring outside the charging period to file a complaint based on a consequence of the time-barred act). Specifically, in *Ledbetter*, the plaintiff argued that "an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." 127 S. Ct. at 2172. The Court rejected this argument and held that the plaintiff's claim was untimely. *Id.* But unlike the plaintiffs in *Ledbetter* and *Ricks*, Mr. Proctor claims that UPS acted with unlawful intent during the charging period (i.e., within the 300 days prior to the filing of the administrative complaint upon which his lawsuit is based). He does not argue that his termination was a delayed effect of alleged acts of discrimination occurring outside the charging period.

In addition, unlike the Court in *Ricks*, we cannot conclude that UPS notified Mr. Proctor of his eventual termination prior to the charging period. *Cf. Ricks*, 449 U.S. at 258 (noting that the plaintiff had received "explicit notice that his employment would end" after a one-year period). Even if we assume that Mr. Proctor's termination in January 2004 was an inevitable consequence of earlier

-11-

employment decisions, the record does not support the conclusion that UPS notified Mr. Proctor of this inevitability. The record contains evidence that he was notified of Dr. Brown's decision recommending he not return to work as a package car driver and of UPS's decision to deny his request for an accommodation. The record does not, however, contain evidence that UPS notified Mr. Proctor that these decisions would inevitably lead to his termination. Indeed, in the March 2003 letter denying Mr. Proctor's request for an accommodation, UPS did not notify him that the denial would result in his discharge; instead, UPS instructed him to call the district workforce planning manager with any questions about his employment status. *Cf. id.* at 258 (holding that the limitations period for filing an administrative charge began to run when the alleged discriminatory act occurred "*and* [*was*] *communicated*" to the employee (emphasis added)).

In short, the argument that Mr. Proctor's discharge inevitably followed from previous employment decisions is UPS's argument, not Mr. Proctor's, and is therefore properly resolved on the merits. Because Mr. Proctor asserts that UPS acted with retaliatory intent during the charging period and the record does not indicate that he received notice of his eventual discharge prior to this period, we conclude that Mr. Proctor's ADA claim is timely.

B.    Retaliation Claim under the ADA

We next consider Mr. Proctor's claim that UPS violated the ADA, 42

U.S.C. § 12203(a), by discharging him in retaliation for filing administrative charges of disability discrimination. When, as in the case before us, the plaintiff does not offer direct evidence of retaliation, we analyze a retaliation claim under the burden-shifting framework delineated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). Following this framework, if Mr. Proctor establishes a prima facie case of retaliation, the burden shifts to UPS to assert a legitimate, nondiscriminatory reason for the adverse action. *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007). If UPS provides a legitimate, nondiscriminatory reason for its decision, the burden shifts back to Mr. Proctor to show that UPS's proffered reason is a "pretext masking discriminatory animus." *Id*.

In order to establish a prima facie case of retaliation, Mr. Proctor must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, – U.S. –, 126 S. Ct. 2405, 2414–15 (2006)).[4] Mr. Proctor clearly engaged

---

[4]After the Supreme Court's recent decision in *Burlington N. & Santa Fe Ry. Co. v. White*, – U.S. – , 126 S. Ct. 2405 (2006), we use a "reasonable employee"

(continued...)

-13-

in protected activity when he filed administrative charges with the OFCCP, EEOC, and the Kansas Human Rights Commission alleging disability discrimination based on UPS's failure to accommodate him and return him to work. *See Stover*, 382 F.3d at 1071 ("There is no dispute that [the plaintiff's] EEO complaints are protected activity."); *Anderson*, 181 F.3d at 1178 ("By filing an EEOC claim, Plaintiff engaged in protected activity."). In addition, a reasonable employee would certainly find UPS's termination of Mr. Proctor a materially adverse action. *See Argo*, 452 F.3d at 1202. Hence, only the third element concerning causation is at issue.

To establish that a causal connection exists between the filing of administrative charges and his discharge, Mr. Proctor may proffer "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Haynes*, 456 F.3d at 1228 (quotation omitted). Proctor filed his last administrative charge on September 8, 2003, and received his termination letter over four months later on January 14,

---

[4](...continued)
standard to determine whether an employment action is adverse in retaliation cases. *Id.* at 2415. In interpreting the scope of Title VII's antiretaliation provision, the Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotations omitted). Because the ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), contains essentially the same language as Title VII's provision, 42 U.S.C. § 2000e-3(a), *White* applies in the ADA context as well. *See Haynes*, 456 F.3d at 1228 (applying the same elements of prima facie case to Title VII and ADA retaliation claims).

2004. Four months is too large a time gap to establish a causal connection. *See Piercy*, 480 F.3d at 1198 (noting that we have found a proximity of three months insufficient to support "a presumption of causation"); *Anderson*, 181 F.3d at 1179 ("[W]e have held that a three-month period, standing alone, is insufficient to establish causation." (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)). In an attempt to establish causation by temporal proximity, Mr. Proctor argues that he engaged in protected activity until the last administrative agency, the OFCCP, issued its finding of no probable cause and its right-to-sue letter on December 19, 2003. According to Mr. Proctor, because UPS and the OFCCP were dealing with his complaint until December 2003, he engaged in protected conduct until the agency issued its decision. Not surprisingly, the Supreme Court has characterized this argument as "utterly implausible." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that the court of appeals rejected "respondent's utterly implausible suggestion that the *EEOC's* issuance of a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the employee"). Mr. Proctor took no part in the agency determination. He engaged in protected activity when he filed the administrative charge on September 8, after which more than four months passed before his discharge.

Because a four-month time period does not support an inference of retaliatory motive, Mr. Proctor must present additional evidence to establish the

necessary causal connection. *See Piercy*, 480 F.3d at 1198–99 ("[T]he passage of time does not necessarily bar a plaintiff's retaliation claim if *additional* evidence establishes the retaliatory motive."); *Haynes*, 456 F.3d at 1228 ("Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. Otherwise, the plaintiff must offer additional evidence to establish causation." (quotation omitted)). The other evidence Mr. Proctor proffers in support of causation is evidence he claims demonstrates the weakness of UPS's proffered reason for his discharge, thereby creating a genuine issue of material fact as to whether UPS's reason is a pretext for retaliation. Although this kind of evidence is typically considered during the third phase of the *McDonnell Douglas* inquiry, Mr. Proctor correctly notes that we have considered evidence of pretext in the prima facie stage of a retaliation claim. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) (considering evidence of pretext in analyzing the causation element of a prima facie case of retaliation under Title VII).

UPS proffers a reason for Mr. Proctor's discharge based on the application of neutral employment policies. The company claims that Mr. Proctor was terminated because Dr. Brown issued a final and binding decision under the CBA that he was unable to perform the essential functions of his job and the company was under no legal duty to accommodate him with a different position; based on these determinations, UPS did not return Mr. Proctor to work, leading to his

termination in January 2004 in accordance with its policy of terminating employees who have not returned to work when their workers' compensation claims are resolved. Mr. Proctor concedes that UPS's proffered reason is a facially legitimate, nonretaliatory reason, but contends that two pieces of evidence suggest that the reason is "unworthy of belief" and therefore a pretext for retaliation. *See Stover*, 382 F.3d at 1073. To establish pretext, Mr. Proctor must present "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo*, 452 F.3d at 1203 (quotations omitted).

As evidence of pretext, Mr. Proctor asserts that the fact that UPS allowed him to return to work in 1999 with a lifting restriction of thirty pounds suggests that UPS later refused to return him to work with a higher lifting restriction in retaliation for filing administrative charges. *See Simms v. Oklahoma*, 165 F.3d 1321, 1328 (10th Cir. 1999) (noting that plaintiff may use evidence concerning prior treatment to demonstrate pretext). But his 1999 return to work was a temporary arrangement. Dr. Brown (the doctor agreed upon by UPS and the Union under the CBA) did not evaluate Mr. Proctor and recommend that he not return to work until April 2002. When UPS permitted Mr. Proctor to return to work in December 1999, it was still waiting for him to reach maximum medical

improvement, at which time UPS could determine whether to return him to work on a permanent basis. Hence, Mr. Proctor's return to work with a temporary accommodation in 1999 cannot support an inference that UPS acted with retaliatory intent in discharging him in 2004.[5]

In addition, we note that, to establish that UPS terminated him with retaliatory intent, Mr. Proctor may not rely on prior acts of alleged discrimination occurring outside the charging period, as these constitute discrete and time-barred actions. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). In arguing that UPS treated him differently by refusing to allow him to return to work with higher lifting restrictions in January 2004, Mr. Proctor is actually challenging UPS's earlier denial of his request for an accommodation. But Mr. Proctor did not file suit based on administrative charges alleging UPS discriminated against him in failing to accommodate his disability. Because UPS's denial of his request for an accommodation constitutes a discrete act of alleged discrimination, it is not actionable unless he files suit based on this act. *See id.* He cannot impute the alleged intent behind a time-barred act to UPS's decision to discharge him based on a neutral policy of relying on the CBA's third-

---

[5]In addition, UPS refused to return Mr. Proctor to work *before* he filed administrative charges. The fact that UPS refused to return him to work both before and after he filed charges also undermines any inference of pretext. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1174 (10th Cir. 2006) (noting that record did not support plaintiff's claim that employer treated her differently after she engaged in protected activity).

doctor procedure and of discharging employees not at work at the close of workers' compensation claims. *See Haynes*, 456 F.3d at 1227 ("[An employee] cannot use [an employer's] alleged intent in performing time-barred discrete actions . . . to attach discriminatory intent or pretext to [a] termination decision based on a neutral policy.").

As further evidence of pretext, Mr. Proctor argues that Dr. Poppa's medical evaluation in April 2003 calls UPS's asserted reason for his termination into question. He contends that a reasonable factfinder could conclude that UPS's asserted reason (i.e., reliance on Dr. Brown's medical evaluation) is "unworthy of belief" based on Dr. Poppa's later and (in his view) more favorable medical evaluation. As UPS points out, however, Dr. Poppa was not evaluating Mr. Proctor's ability to perform the essential functions of his job. Instead, he was examining Mr. Proctor to assess his workers' compensation disability rating. In addition, as the District Court noted, Dr. Poppa did not state that Mr. Proctor can perform the job's essential functions; indeed, the doctor's findings suggest that Mr. Proctor may not be able to perform these functions (e.g., lifting seventy pounds above shoulder level).

Moreover, in the context of a retaliation claim, the crucial question is not whether Mr. Proctor can in fact perform the essential functions of his job. The relevant question is whether Mr. Proctor can show that UPS's "motive for taking adverse action was its desire to retaliate for the protected activity." *Wells*, 325

F.3d at 1218. In other words, we must determine whether UPS treated Mr. Proctor differently because he filed administrative charges of disability discrimination, *id*. at 1219, not whether UPS correctly concluded that he could not perform the essential functions of his job. As we have cautioned, "the relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Stover*, 382 F.3d at 1076 (quotation omitted); *see also Piercy*, 480 F.3d at 1200 ("Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision."). Mr. Proctor has failed to offer any evidence that suggests UPS based his discharge on a retaliatory motive, rather than on its neutral employment policies. Notably, he does not challenge UPS's policy of terminating an employee based on a final and binding doctor's decision under the CBA once all workers' compensation claims are resolved. He does not argue, for example, that UPS does not uniformly apply this policy. *See Haynes*, 456 F.3d at 1228–29 (noting that employee who failed to establish causation element of retaliation claim did not allege that her employer applied employment policy in discriminatory manner). Nor does he argue that UPS used the policy itself to discriminate against a class of employees. *See Piercy*, 480 F.3d at 1204 (noting that plaintiff need not prove discriminatory motive when employment policy is discriminatory on its face); *see also Ledbetter*, 127 S. Ct. at 2173–74 (noting that an employer who adopts a facially discriminatory pay

structure engages in unlawful discrimination each time it uses the pay structure).

The evidence Mr. Proctor proffers therefore fails to establish the causation element of a prima facie case. *See McGowan v. City of Eufala*, 472 F.3d 736, 747 (10th Cir. 2006) ("If the reason for the claimed adverse action does not flow from a discriminatory motive, it lacks the requisite causal connection to the adverse action.").

Furthermore, even if we were to assume that Mr. Proctor has established a prima facie case, the evidence in its totality does not raise a genuine issue of material fact regarding the third step of the *McDonnell Douglas* framework, that is, whether UPS's proffered reason is a pretext for retaliation. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998) (noting that we consider the totality of the plaintiff's circumstantial evidence of pretext); *see also Stover*, 382 F.3d at 1073–74 (assuming plaintiff established a prima facie case but holding she failed to demonstrate a genuine issue of material fact regarding pretext); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1242 (10th Cir. 2004) (affirming district court's grant of summary judgment in employer's favor because plaintiff failed to raise genuine issue of material fact regarding pretext). As the above discussion of Mr. Proctor's evidence regarding pretext demonstrates, he has not created a disputed issue as to whether UPS's proffered reason is "unworthy of belief." We therefore affirm the District Court's entry of summary judgment in UPS's favor on Mr. Proctor's claim of retaliation under the ADA.

C.     Retaliation Claim Under Kansas Law

Kansas courts also apply the *McDonnell Douglas* burden-shifting framework to claims of employment discrimination, including claims of retaliatory discharge for filing a workers' compensation claim. *Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility*, 101 P.3d 1170, 1177 (Kan. 2004); *Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n of Dighton*, 35 P.3d 892, 898 (Kan. 2001).  As discussed above, under this framework, Mr. Proctor must establish a prima facie case of retaliation. *Gonzalez-Centeno*, 101 P.3d at 1177.  If he meets this burden, UPS must come forward with a legitimate, nonretaliatory reason for the discharge. *Id.*  Mr. Proctor then has the burden of showing "by a preponderance of the evidence" that this legitimate reason is a pretext for retaliation in violation of state law. *Id.*; *see also Magnum Foods, Inc. v. Cont'l Cas. Co.*, 36 F.3d 1491, 1503 (10th Cir. 1994) (noting that we apply state law when examining evidence in terms of underlying burden of proof).

To establish a prima facie case for retaliation under Kansas law, a plaintiff must establish four elements:

> (1) The plaintiff filed a claim for workers compensation benefits or sustained an injury for which he or she might assert a future claim for such benefits; (2) the employer had knowledge of the plaintiff's workers compensation claim injury; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination.

*Gonzalez-Centeno*, 101 P.3d at 1177.  Here, the parties agree that the first three

elements have been established. Only the fourth element regarding causation is at issue.

To determine whether a causal connection exists, Kansas courts typically begin by asking whether the employee's protected activity and the termination are closely connected in time. *Rebarchek*, 35 P.3d at 899; *see also White v. Tomasic*, 69 P.3d 208, 212 (Kan. Ct. App. 2003) ("Close temporal proximity between a workplace injury or the filing of a workers compensation claim and the adverse employment action may be highly persuasive evidence of retaliation." (quotation omitted)). Although Mr. Proctor filed his workers' compensation claim in November 1999, he argues that he engaged in protected activity as late as December 2003, the month before he received notice of his discharge. According to Mr. Proctor, his participation in settlement negotiations and the appeal of his workers' compensation claim, which was finalized in December 2003, constitute protected activity. Kansas courts have not squarely addressed whether an employee's ongoing participation in litigation constitutes protected activity, instead noting only that the filing of a claim is protected activity. *See Rebarchek*, 35 P.3d at 899 ("Proximity in time between the *claim* and discharge is a typical beginning point for proof of a causal connection." (emphasis added)). We will therefore assume, without deciding, that Mr. Proctor has established a prima facie case of retaliation for participating in the appeal of his workers' compensation claim and proceed to determine whether he has presented evidence indicating that

-23-

UPS's proffered legitimate reason is a pretext for retaliation. *See Stover*, 382 F.3d at 1073 (assuming plaintiff established a prima facie case and deciding whether employer was entitled to summary judgment based on plaintiff's evidence of pretext).

As noted above, UPS has asserted a facially legitimate, nonretaliatory reason for Mr. Proctor's termination, namely that, pursuant to the final and binding doctor's decision under the CBA, Mr. Proctor was not returned to work and was therefore discharged once his workers' compensation claims were closed. In response, Mr. Proctor points to five pieces of evidence that he claims create a genuine issue of material fact regarding pretext. In addition to the evidence proffered in support of his retaliation claim under the ADA, Mr. Proctor claims three pieces of circumstantial evidence create a disputed issue concerning pretext: (1) the temporal proximity between the resolution of his workers' compensation claim and his discharge; (2) a disparaging remark made by a UPS employee; and (3) a reference to his workers' compensation claim in his termination letter. We consider each piece of evidence below.

First, Mr. Proctor asks us to consider the same evidence proffered in support of his retaliation claim under the ADA, that is, that a reasonable factfinder could infer retaliation based on his temporary return to work in 1999 and Dr. Poppa's medical evaluation. But as we explained above, the fact that UPS temporarily returned Mr. Proctor to work with lifting restrictions in 1999 has

-24-

no bearing on UPS's motive in terminating him after Dr. Brown recommended he not return to work on a permanent basis. Similarly, Dr. Poppa's medical evaluation is not probative of pretext; the existence of another medical opinion obtained at the request of UPS's insurer does not contradict or otherwise weaken UPS's assertion that it relied on Dr. Brown's final and binding decision under the CBA.

Next, we consider Mr. Proctor's evidence of temporal proximity. As discussed above, we assume, but do not decide, that temporal proximity is present in this case based on the fact that Mr. Proctor received notice of his termination in close proximity to the resolution of the appeal of his workers' compensation claim. Although we may consider evidence of temporal proximity—typically used to establish a prima facie case—in analyzing pretext, *see Gonzalez-Centeno*, 101 P.3d at 1178, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext, *see Annett*, 371 F.3d at 1240–41; *Anderson*, 181 F.3d at 1180 (assuming temporal proximity present for purposes of prima facie case but concluding that proximity alone was insufficient to survive summary judgment on issue of pretext).[6] We must therefore determine whether

[6]As this Court has previously held, temporal proximity is sufficient to establish a prima facie case, but not to establish pretext, because the evidentiary burden is different: "The burden of establishing a prima facie case [in the *McDonnell Douglas* framework] is not onerous. It is because of this relatively lax burden that we allow temporal proximity between a protected activity and an adverse action to establish a prima facie case; for the same reason, we have not

(continued...)

temporal proximity combined with other evidence proffered by Mr. Proctor creates a reasonable inference that UPS's asserted reason is unworthy of belief. *See Gonzales-Centeno*, 101 P.3d at 1178 (noting that, to survive summary judgment, the plaintiff must demonstrate a genuine issue of material fact as to whether the employer's asserted reason is "unworthy of belief").

As further evidence that UPS's asserted reason is unworthy of belief, Mr. Proctor notes the crass and disparaging remark made by Monica Sloan in July 2003 when his union representative asked her about the status of settlement negotiations in his workers' compensation case and whether UPS would allow Mr. Proctor to return to work. Mr. Proctor claims he heard Ms. Sloan tell his union representative: "We're going to pay him a work comp settlement and as far as I'm concerned he can go eat shit and die." Although this alleged remark certainly suggests that Ms. Sloan was frustrated by Mr. Proctor's case, one isolated remark made several months before he received notice of his termination does not create a genuine issue of material fact concerning UPS's motivation. Ms. Sloan testified that the January 2004 termination letter was a result of UPS's policy of

---

[6](...continued)
imported this lessened standard to pretext analysis where the burden is more demanding and requires a plaintiff to assume the normal burden of any plaintiff to prove his or her case at trial." *Annett*, 371 F.3d at 1241 (alteration in original) (citations and quotations omitted). Kansas courts have also recognized the different burdens required at these two stages. *See Rebarchek*, 35 P.3d at 901. We therefore conclude that Kansas courts would require a plaintiff to show more than temporal proximity to establish a genuine issue of material fact concerning pretext.

terminating employees who are not back to work at the close of their workers' compensation claims. Nothing in the record contradicts her understanding that Mr. Proctor's termination was inevitable as a matter of UPS policy, that is, that Mr. Proctor would be discharged at the close of his workers' compensation case because Dr. Brown recommended he not return to work and UPS had determined he was not eligible for an accommodation. This alleged statement does not, therefore, support an inference of retaliatory motive.

Similarly, we are unconvinced by Mr. Proctor's argument that a reasonable factfinder could infer retaliatory motive based on the reference to his workers' compensation claim in the January 2004 letter notifying him of his discharge. The letter contained the following language: "This is to inform you on January 14, 2004, UPS closed all worker[s'] compensation claims on John Proctor. . . . This employee will be separated from UPS as of January 14, 2004." Rather than arguing that the letter calls UPS's facially legitimate reason into question, Mr. Proctor argues that UPS could not rely on the medical evaluations conducted in 2002 in accordance with the CBA to terminate him in January 2004. In essence, he argues that UPS violated Kansas law by terminating him at the close of his workers' compensation case because it did not have "ample evidence" that he would not be able to return to work. In support of this contention, he cites our decision in *Sanjuan v. IBP, Inc.*, 275 F.3d 1290 (10th Cir. 2002).

Our analysis of Kansas law in *Sanjuan* does not, however, support Mr.

Proctor's argument. The Kansas case discussed in *Sanjuan* stands for the proposition that an employee can prevail on a retaliation claim by showing the employer acted with retaliatory animus before acquiring ample evidence that the employee will not be able to return to work:

> Although the public policy exception that created the tort of retaliatory discharge for terminating an injured employee for filing a workers compensation claim does not apply to an injured employee who is unable to return to his or her former job after an injury, the requirement that an injured employee be able to return to his or her former position will not preclude an injured employee's claim for retaliatory discharge *when the injured employee can show a retaliatory motive* on the part of the employer before the employer had ample evidence that the injured employee would be unable to perform his or her former job.

*Gertsch v. Cent. Electropolishing Co.*, 26 P.3d 87, 90 (Kan. Ct. App. 2001) (emphasis added), *discussed in Sanjuan*, 275 F.3d at 1295. In other words, if an employer has ample evidence that an employee will *not* be able to return to work on a permanent basis, an employee may not sustain an action based on retaliatory discharge under Kansas law. Conversely, an employee may prevail on a retaliatory discharge claim if the employer did not have ample evidence *and* the employee "can show a retaliatory motive on the part of the employer." *Gertsch*, 26 P.3d at 90.

Here, we need not determine whether UPS had "ample evidence" of Mr. Proctor's inability to return to work because Mr. Proctor has failed to present evidence that establishes a genuine issue of material fact regarding UPS's motive.

-28-

He has not presented any evidence that disputes UPS's assertion that his termination was based on Dr. Brown's final and binding decision under the CBA and UPS's policy of terminating employees not at work at the close of their workers' compensation claims. That is, the critical question in the present case is not whether Mr. Proctor could perform the essential functions of his job in January 2004, but whether UPS's proffered reason is a pretext for retaliation. *See Sanjuan*, 275 F.3d at 1295 ("In the final analysis, one asks, 'What was [the employer's] motive for firing [the employee]?'"). The reference to his workers' compensation claims in his termination letter does not suggest that UPS's reliance on Dr. Brown's evaluation is a "cover-up or pretext for retaliatory discharge." *Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002). Instead, it simply indicates that the notice of termination coincides with the closure of his workers' compensation claims.

In sum, even if we assume that Mr. Proctor has established a prima facie case based on temporal proximity, he has not presented evidence sufficient to create a genuine issue of material fact regarding UPS's motive for terminating him. *See Bracken*, 38 P.3d at 684 (holding that plaintiff failed to establish inference of retaliatory intent sufficient to survive summary judgment when evidence did not suggest that employer used a general policy as a pretext for her discharge). We therefore affirm the District Court's entry of summary judgment in UPS's favor on Mr. Proctor's claim of retaliatory discharge under Kansas law.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's grant of summary judgment in UPS's favor on Mr. Proctor's claims of unlawful retaliation under the ADA and Kansas law. In addition, we GRANT UPS's motion to file portions of its appendix under seal.